IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARY WIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-CV-425-KFP |
| | ) | |
| THE CITY OF MONTGOMERY, | ) | |
| ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case is before the Court for findings of fact and conclusions of law following

a bench trial. After a review of the evidence and briefing, the Court finds as follows:

## I.    PROCEDURAL BACKGROUND

Plaintiff filed this action in July 2017, alleging claims of unlawful discrimination

and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e, et seq.; the Age Discrimination and Employment Act, as amended, 29

U.S.C. § 621, et seq.; and the Americans with Disability Act, 42 U.S.C. § 12101, et seq.

Doc. 1. Defendant moved for summary judgment on each of these claims, and the Court

granted summary judgment in favor of Defendant on Plaintiff's ADEA discrimination

claim but denied summary judgment on her ADA discrimination claims and her Title VII,

ADA, and ADEA retaliation claims. Doc. 53. After each party waived the right to a jury

trial (Doc. 138), the Court held a bench trial and allowed the parties to submit post-trial

briefs with proposed factual findings and conclusions of law based on the evidence presented at trial.[1]

## II.   FACTUAL FINDINGS

Based on the parties' stipulations and the evidence presented at trial, the Court makes the factual findings set forth below.

### A.   Background

In 1970, Mary Wiggins began working as a typist for the City of Montgomery, which now has approximately 2,600 employees. Doc. 129 at 4; Trial Tr. vol. 3, 28. By 1995, she was working as an Account Clerk II in the License and Revenue Division of the City's Finance Department. Doc. 129 at 4. In 2000, she fell down a flight of stairs while leaving work and injured her knee, requiring a knee replacement and leaving her dependent on a walker for stability when walking. *Id*.

On April 8, 2015, still working as an account clerk, Wiggins received her annual performance evaluation, on which it was noted that she met all expectations and warranted

---

[1] At the close of Plaintiff's evidence, she made a motion for judgment as a matter of law under Rule 52(c) of the Federal Rules of Civil Procedure, which the Court denied. Plaintiff renewed the motion at the close of all evidence. The Court reserved ruling on that motion, and it remains pending. The Court is required to note its findings of fact and conclusions of law in any action tried without a jury, regardless of Plaintiff's motion. *See* Rule Fed. R. Civ. P. 52(a)(1) (stating that the court must find the facts and sate its conclusions of law separately and that they "may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision."). As stated by a district court in our circuit: "[T]he difference between tackling the merits of a Rule 52(c) motion at the close of all the evidence and issuing Rule 52(a) findings of fact and conclusions of law [in an action tried on the facts without a jury] appears to be largely one of semantics. There is no material difference between entering a judgment pursuant to Rule 52(a) and doing so under Rule 52(c) at the close of all the evidence; rather, the Motion for Judgment as a Matter of Law would entail the functional equivalent of the Rule 52(a) protocol that this Court must follow anyway." *Harris v. Busby*, No. 7:16-CV-135 (WLS), 2020 WL 9763091, at *2 (M.D. Ga. Oct. 16, 2020) (citing *Nettles v. Utilities*, No. 13-0605-WS-C, 2015 WL 4910983, at *1 (S.D. Ala. Aug. 17, 2015)).

a merit increase. Trial Tr. vol. 1, 169–72. The next day on April 9, the City posted two job openings for revenue examiner positions. *Id*. at 33–34; Doc. 142-19. A revenue examiner is a step up from an account clerk, which is considered the training ground for revenue examiners. Trial Tr. vol. 1, 75; Trial Tr. vol. 2, 39. According to the job posting, a revenue examiner is responsible for "inspecting business premises in an assigned geographical location for violations and verifications," and the work is performed "primarily in the field involving travel to and visits to local business locations, which may require working in inclement weather, visiting construction sites, climbing stairs, walking over rough terrain, minimal lifting of boxed documents and/or laptop and printer, etc." Doc. 129 at 4.

### B.    Wiggins's Application for Revenue Examiner Position

Wiggins submitted her application for the positions on April 15, 2015.[2] Doc. 142-20 at 1. By then, she had been an account clerk for twenty years. On her application, she noted that she had recently been asked to do a ride-along with a current revenue examiner "on a regular day out in the field" to "get the feel and experience of field work" and that it was "very helpful" and a "good experience." *Id*. at 3, 5. She further wrote: "Others younger than myself (age and time employed with the City have been able to get better salaries and opportunities) have been upgraded to Revenue Examiners while I remain at the same pay and look forward to nothing better as for salary and retirement." *Id*. at 3. She explained that she "use[s] a walker when walking long distances and for knee support." *Id*. She also mentioned that the finance director had advised that the division "could use one or two

---

[2] Wiggins had unsuccessfully applied for this position at least once before April 2015; however, the number of times she applied is not clear based on the evidence presented at trial.

inside revenue examiners" and that she "could benefit in working a[n] inside position." *Id*. She stated that she was "still on the front line, watching others go around [her]." *Id*. She also stated that she cannot walk on rough terrain, as the job description required, and that she felt like no one cared about her and her situation. *Id*. at 3, 5–6.

At trial, the City equivocated when questioned about whether key personnel perceived Wiggins's statements on her application as a complaint of discrimination. For example, when asked if she understood that Wiggins was making a complaint of discrimination, Cami Hacker, senior personnel analyst at the City-County Personnel Board,[3] first avoided the question, responding that "there was language used that indicated that she might be unhappy about what was happening in her position." Trial Tr. vol. 1, 45. When asked again if she understood the language to be a complaint of discrimination, Hacker testified, "I did not. I just knew it didn't sound like a description of work." *Id*. This differed from Hacker's deposition testimony three years earlier, where she was asked if she understood Wiggins to be raising concerns of discrimination and responded, "That's the way I saw it, yes." *Id*. at 46.

In fact, after reading Wiggins's application, Hacker brought it to the attention of her supervisor, Carmen Douglas, the personnel director of the Personnel Board. In response, Douglas emailed Hacker with language to include in a letter to Wiggins describing the

---

[3] The City-County Personnel Board handles personnel functions, such as pay classifications, hiring, investigations, training, testing, and developing of registers, for the City of Montgomery, Montgomery County, and the Montgomery airport. Trial Tr. vol. 1, 97, 101. It handles "[j]ust about any human resource process except for benefits and payroll." *Id*. at 101. To fill the revenue examiner positions at issue in this case, the Personnel Board reviewed the applications submitted, determined whether an applicant was qualified, certified a list of qualified applicants on a promotion register, and forwarded that list to Faye Comer, revenue supervisor, and Barry Crabb, finance director. Trial Tr. vol. 2, 5–6.

nondiscrimination policies of the Personnel Board and the City and explaining how to file a formal complaint.[4] Trial Tr. vol. 1, 46–50, 115. Despite having drafted a letter outlining *nondiscrimination* policies, Douglas, like Hacker, would not admit on the stand that she viewed Wiggins's statements as a complaint of discrimination. When asked why she included information about nondiscrimination policies in a letter to Wiggins, Douglas was vague: "Because when we conduct the training for the City, the County, and the airport, we discuss this as part of our nondiscrimination policy." *Id*. at 114. When asked again if she included it because she knew Wiggins was making complaints of discrimination, Douglas stood firm and replied, "No." *Id*. at 115.

Wiggins was not the only applicant for the two open revenue examiner positions. Three of her co-employees, Patrick Vines, Deondra Freeman, and J.C. Jones, also applied. *Id*. at 37–38; Doc. 142-21; 142-22; and Doc. 142-68. After Cami Hacker reviewed the applicants to determine if they met the minimum job qualifications, she prepared a list on April 23 certifying Wiggins, Vines, and Freeman as qualified applicants. Jones was not on the list. Trial Tr. vol. 1, 29–30, 36, 38–42.

Although the Personnel Board certifies qualified applicants and the City has no input into the certification list, the City does have authority to ask that someone be removed from the list, "predominantly for things like falsification of an application." Trial Tr. vol. 1, 44. On April 23, Margaret Broekhoven, another Personnel Board employee, emailed the certified list of applicants with their applications to Barry Crabb, finance director, and

---

[4] Douglas's instructions stated that Wiggins should submit a written statement to Mayor Todd Strange, Ron Samms in City Investigations, or Carmen Douglas, Personnel Director. Doc. 142-25.

Charles Wilson, revenue division supervisor. *Id*. at 52, Doc. 142-28. Cami Hacker was copied on the email. Trial Tr. vol. 1, 52; Doc. 142-28. Within half an hour of Broekhoven's email attaching the applications, Hacker forwarded the email to Douglas with the following note: "Just a reminder that Barry may call you about wanting to remove Ms. Wiggins." Trial Tr. vol. 1, 54–56; Doc. 142-28. At trial, Hacker could not recall why she sent the email reminder, and Douglas said she could not recall what the email meant or if she ever discussed it with Hacker. Trial Tr. vol. 1, 54–55, 117–18. Crabb agreed that he had "expressed something to the personnel board about [his] desire to remove Ms. Wiggins from the list of people to be considered for the job," but there was no evidence of why he wanted her removed or that he followed through with the request. *Id*. at 187. A few days later, however, Crabb requested that the position be reopened for additional applications. *Id*. at 188.

After the position was reopened, Cheryl Urquhart, who had been an account clerk in the City's treasury division for three years, applied. *Id*. at 61; Trial Tr. vol. 3, 118. Hacker then issued a second certified list on May 12 that included Urquhart, the three employees previously certified (Wiggins, Vines, and Freeman), and Jones, who applied the first time but was not on the initial certification list.[5] Trial Tr. vol. 1, 62–63.

---

[5] Jones was ultimately chosen for one of the positions. The fill request form in his file is dated April 23, 2015, and reflects that he was one of five candidates originally certified on that date. Doc. 142-55. However, undisputed evidence at trial establishes that only three applicants were certified on the first list, that Jones was not on that list, and that the second list, which included Jones and the four other applicants, was prepared on May 12, 2015, after the position was reopened. *See* Docs. 142-16 at 1 and 142-55 at 1. Thus, it appears the form in Jones's file may have been backdated, although the purpose of this was not evinced at trial.

### C.      Interviews for the Revenue Examiner Positions

Three days after the second certified list was prepared, Faye Comer was promoted to license and revenue supervisor. Trial Tr. vol. 2, 4–5. Comer had worked for the City since 1993 and before her promotion was a revenue auditor in the finance department. *Id*. at 3–4. As the new revenue supervisor, Comer was responsible for interviewing and hiring for the revenue examiner positions. Doc. 129 at 5. She reported to Charles Wilson, revenue division supervisor, who in turn reported to Barry Crabb, finance director.[6] Trial Tr. vol. 2, 27–28.

Comer held interviews on May 28, but beforehand she reviewed each employee's application, including Wiggins's complaints about previous discrimination. Doc. 129 at 5; Trial Tr. vol. 2, 24–25, 29. As with Hacker and Douglas, it was difficult to get a direct answer from Comer on whether she believed Wiggins was complaining of discrimination. When asked if she saw Wiggins's application as a complaint that she was treated differently than younger people, Comer replied: "I saw that she definitely wanted that to be expressed." Trial Tr. vol. 2, 27. She was later asked, "Did you understand that Ms. Wiggins was complaining about being bypassed for this promotion?" Comer responded, "I believe

---

[6] Based on temporal proximity of Crabb's receipt of the email with Wiggins's application and complaint of discrimination and Hacker's email about removing her from the list, Crabb's unexplained desire to remove Wiggins from the list of qualified applicants might suggest a desire to retaliate for Wiggins's statements in her application. However, it is undisputed that Comer was responsible for interviewing and recommending candidates, and there is no evidence that she was aware of Crabb's desire to remove Wiggins, that Crabb played a role in Comer's failure to recommend Wiggins, or that Crabb played any role in Comer's recommendation of a candidate. Crabb testified that he would have questioned Comer if he had not agreed with her recommendations, but he did no investigating or interviewing on his own. Trial Tr. vol. 1, 211. For the positions at issue in this lawsuit, Crabb knew the individuals Comer recommended, relied on her recommendations, and agreed with her selections. *Id*. at 199.

that she was definitely wanting to get that information in front of the management." *Id*. at 28. When asked a third time whether she viewed the statements in the application as being a complaint of discrimination, she finally conceded, "In reading it, I think so." *Id*. at 29.[7]

As for the rest of Wiggins's application, Comer agreed that Wiggins's work experience "definitely" qualified her for the job of revenue examiner, but Comer "felt like she would not be successful if she could not actually go out." *Id*. at 30–31. Comer said the inability to walk on rough terrain meant Wiggins could not physically do the job, and she knew the job required going out on a "daily basis and for durations of time in all types of weather," which Comer thought would be difficult for Wiggins. *Id*. at 31. Nonetheless, Comer went forward with an interview so Wiggins "could let [her] know what she could physically do." *Id*. at 32.

Comer had a list of questions she asked all applicants, and she took notes during the interviews. In describing these notes, Comer said she wrote down responses to her questions, but she was also trying to document what was important. *Id*. at 37. The notes reflect that Wiggins complained of "always [being] overlooked" and that "maybe" an inside revenue examiner position could be created, but they also reflect that Wiggins knew the position required going into the field to see if businesses were licensed and that she

---

[7] The reluctance of Hacker, a senior personnel analyst, Douglas, a personnel director, and Comer, a supervisor, to admit that Wiggins's statements were complaints of discrimination appears to have been an attempt to disavow knowledge of protected activity to defeat Wiggins's retaliation claim and to relieve the City of any duty to investigate. Given the plain nature of Wiggins's statements, the Court struggles to see how they could be perceived as anything but complaints of discrimination. These witnesses' inability or unwillingness to give a straightforward response—especially considering their job titles and personnel or supervisory experience—had a significant impact on their credibility.

may have to handle irate taxpayers differently depending on whether they were encountered inside the office or out in the field. Doc. 142-32.

At trial, Comer testified that Wiggins "articulated" in the interview that she was interested in revenue work but not going out in the field. Trial Tr. vol. 2, 37. She also testified that Wiggins spent "a lot of time complaining about past administrations and different things that had occurred to her." *Id*. at 63. Comer said she and Wiggins discussed her physical ability to work in the field and that Comer touched on some of the working conditions, such as inclement weather, getting in and out of a vehicle, climbing stairs, and rough terrain. *Id*. at 151–53. According to Comer, Wiggins said she could not perform those functions and could not work outside. *Id*. at 152–54. Comer's testimony on this point is inconsistent with Wiggins's application, where she described a ride-along to get the experience of going out in the field. The testimony is also inconsistent with Comer's interview notes. The notes, meant to document what was important, reflect none of these statements by Wiggins and, instead, document Wiggins's understanding that she would be dealing with taxpayers out in the field.

Not unexpectedly, Wiggins's recollection of the interview differs from Comer's. Wiggins agrees that she discussed how younger employees were being promoted and that she could have benefitted from an inside position, but she did not "go in and say[ ] I want inside and that's it." Trial Tr. vol. 3, 77. She brought up the ADA[8] and said that someone had suggested there were "ways to accommodate or help the City to accommodate the

---

[8] Wiggins referred to the ADA as the "Citizens with Disabilities Act" at the time. Trial Tr. vol. 3, at 58.

person applying," but she said Comer made no response to this statement. *Id*. at 59. She also testified that neither climbing stairs nor inclement weather was discussed, and Comer never asked if she could walk over rough terrain. *Id*. at 72. She said Comer mentioned Wiggins's use of a walker and asked if she needed help with it, but Comer did not ask detailed questions about her ability to use it. *Id*. at 75. Wiggins denies telling Comer that she could not go out into the field and could only work inside. *Id*. at 60, 79, 86–87. Wiggins admitted she cannot walk on rough terrain, but she believed she could have telephoned the person in charge of a business she visited and arranged to meet outside the building if she encountered rough terrain. *Id*. at 54–55. Because Wiggins's testimony is consistent with her application and Comer's interview notes, both of which reflect Wiggins's expectation that she would be working in the field if promoted, the Court rejects Comer's testimony that Wiggins said she could not go out in the field.

Although the timeline is unclear, Comer reported the complaints in Wiggins's application to her supervisor, Charles Wilson, and at some point Wilson told Comer there had been previous EEOC investigations regarding Wiggins. Trial Tr. vol. 2, 27, 82–83. Again, it is not clear if this occurred before or after Comer interviewed Wiggins. After the interview, Comer reported Wiggins's complaints made during the interview, which Comer understood to relate to previous decisions regarding Wiggins's employment, to Wilson and to Barry Crabb. *Id*. at 46, 99. Comer said she had no discussions with Wilson about whether an accommodation could be made, but she told Crabb that Wiggins felt like younger people were getting better opportunities and discussed the possibility of an inside revenue position.

*Id*. at 46–48, 156. Crabb could not recall whether Comer relayed any type of complaint or request for accommodation made by Wiggins during her interview.[9] Trial Tr. vol. 1, 192.

According to Comer, who supervised the revenue examiners, modifying job duties so Wiggins could perform revenue examiner duties inside would not have imposed a hardship on the City or caused operational problems. Trial Tr. vol. 2, 79–80. Nonetheless, on June 1, she recommended that J.C. Jones, who was not on the original list of qualified applicants, and Patrick Vines be promoted to fill the two open revenue examiner positions. *Id*. at 49; Doc. 142-34. Comer's recommendations were approved by Crabb the next day and made effective June 5.[10] Trial Tr. vol. 2, 49–52, 54. As mentioned above, by this time Wiggins had been working as an account clerk, the "training ground" for revenue examiners, for twenty years. *Id*. at 39. Vines had been an account clerk for eleven years, and Jones only one.[11] *Id*. at 18–19, 103–04; Trial Tr. vol. 3, 148.

---

[9] Crabb recalls speaking to his predecessor about the possibility of creating an inside position, but he says they could not figure out how to make it work. Trial Tr. vol. 1, 195. This conversation occurred well after Wiggins's interview and was the result of a 2016 on-site investigation by the EEOC after Wiggins filed a charge of discrimination. *Id*. at 195–96.

[10] Although the promotions became effective June 5, Comer did not immediately inform Wiggins of her non-selection, despite an inquiry from Wiggins about it. Trial Tr. vol. 2, 54–55. In fact, in response to a June 10 email from Wiggins, she told Wiggins that she would notify her when she received word from finance as to who was selected. *Id*. at 55; Doc. 142-35. Comer may not have known if her recommendations of Vines and Jones had received final approval, but she knew Wiggins had not been selected.

[11] In addition to the requirements described above, the revenue examiner position required two years of delinquent account collection work, with revenue tax experience preferred. Trial Tr. vol. 2, 17. Before working for the City, Jones was a patient representative at a medical center for about 14 months, where part of his job included delinquent account collection work, giving him the required two years of collection work. *Id*. at 101–02. Before that, however, he worked at Sam's Club, as a teller at a bank, and as a manager at a jazz and blues club. *Id*. at 19–20.

### D.    Wiggins's EEOC Charge

On June 22 after learning that Vines and Jones were chosen as revenue examiners, Wiggins filed an EEOC charge of discrimination and retaliation, and her lawyer sent a letter to Mayor Todd Strange, City Investigations Director Ron Samms, and Personnel Director Carmen Douglas. Docs. 142-37, 142-38. The letter referenced Wiggins's "ongoing claims for discrimination and retaliation," advised that she had filed an EEOC charge, and enclosed a copy of the charge. Doc. 142-37.

Crabb received the letter on June 29, recalls seeing it, and provided it to someone for placement in Wiggins's personnel file. Trial Tr. vol. 1, 206. At trial, he could not recall if he discussed it with Comer; however, in his deposition he said he was sure he did. *Id*. at 207–208. Mayor Strange had no recollection of the letter. Trial Tr. vol. 3, 17. Comer testified that she had not seen or read the letter, and, contrary to Crabb's testimony, had no recollection of discussing it with him. Trial Tr. vol. 2, 57–59. She also had no recollection of when she became aware of Wiggins's EEOC charge. *Id*. at 60.

Carmen Douglas remembers receiving the letter, but she did not investigate Wiggins's claims. Trial Tr. vol. 1, 107–08. Douglas testified that the Personnel Board does not investigate when an EEOC investigation is ongoing because it "would not want to conflict or appear to be interfering with the current investigation taking place." *Id*. at 101. Thus, no investigation was ever done. Douglas did not investigate Wiggins's complaint in her application because it was not a "formal" complaint at that time,[12] and she did not

---

[12] Douglas says there was no investigation following Wiggins's application because she "didn't receive a formal complaint." Trial Tr. vol. 1, 115. According to Douglas, "if there is a situation where an employee

investigate the June 22 letter and EEOC charge because she did not want to interfere with an EEOC investigation.[13] *Id*. at 123. Based on this testimony, it seems that informal complaints of discrimination are ignored, and formal complaints of discrimination are investigated only if no EEOC charge has been filed. Whatever the policy, it is clear that Wiggins complained of discrimination on her application, complained of discrimination in her interview, and complained again in a letter from her attorney on June 22. She was ignored each time.[14]

### E.     The Third Revenue Examiner Position

Before Comer conducted interviews for the two revenue examiner positions, a third revenue examiner position became available. The request to fill this position was issued on June 24. Trial Tr. vol. 2, 61. Because the City used the same candidates from the previous list and those candidates had already been interviewed, no further interviews were

---

could possibly have a complaint, we tell them what the process is and what they need to do to file a complaint." *Id*. at 111.

[13] The letter followed the instructions Douglas had passed to Wiggins through Hacker after Hacker shared Wiggins's application with Douglas. Those instructions cited to the policies and explained that a complaint should be made via a written statement to the Mayor, City Investigations, and Personnel Director. Trial Tr. vol. 1, 50; Doc. 142-24.

[14] It is unclear how an investigation may have actually proceeded if the City had bothered to conduct one. Douglas said: "The City handbook is not a document that is published by the personnel board. That is not my document. No." Trial Tr. vol. 1, 98. Although she is listed as a person to whom employees can complain about discrimination and heads the board responsible for investigating complaints of discrimination against the City, Douglas would not admit that she should be familiar with the City's ADA policies or that she had to make herself familiar with the City's ADA policy if called upon to investigate. *Id*. at 98–104. When she refused to acknowledge any familiarity with the policy, she was asked if the City's handbook governs her actions when investigating an alleged violation of the City's alleged violation of its policy. She responded, "I don't fall under the City handbook. I fall under the rules and regs of the Montgomery City County Personnel Board. So I would have to read this to see if this is something that would be applicable to what I do." *Id*. at 102. In her role, she might very well be familiar generally with discrimination laws, but logic dictates that anyone who investigates an alleged violation of a policy must necessarily be familiar with that policy to determine if it was violated. Douglas's testimony suggests that she has never read the City's handbook. As with previous testimony, the refusal to give straightforward answers affected the witness's credibility on this issue.

conducted. *Id*. at 160. On July 1, the Personnel Department issued a list certifying Wiggins, Freeman, and Urquhart as qualified applicants. Trial Tr. vol. 1, 66–67. According to Comer, on approximately July 1 she spoke to Wiggins and took notes of the conversation. Trial Tr. vol. 2, 164; Doc. 142-9. Her notes reflect that Wiggins was upset, said she could not go into the field daily, and said a position would have to be created for her to be promoted. Trial Tr. vol. 2, 164–65; Doc. 142-9. Comer made another note of an alleged conversation with Wiggins on July 20. Trial Tr. vol. 2, 165–166; Doc. 142-9. This note reflects that Wiggins again stated she could not do the job because it required "a large percentage of outside contact with the public." Trial Tr. vol. 2, 166; Doc. 142-9. On July 9, Comer recommended Urquhart for the third revenue examiner position. Trial Tr. vol. 1, 209; Trial Tr. vol. 2, 62; Doc. 142-39. Crabb approved the recommendation, and Urquhart's promotion became effective July 17. Trial Tr. vol. 2, 64.

Wiggins denies that the two conversations above took place and testified that the only time she had a "connection with Mrs. Comer was in an interview." Trial Tr. vol. 3, 74, 82–85. Wiggins insists that her only discussion with Comer about her physical abilities was during her interview, when Comer asked if Wiggins needed help with the walker but asked no questions about Wiggins's ability to use it. *Id*. at 75, 87. She denies telling Comer that she could not go out in the field, that a position would have to be created, or that she could not do the job because it required a large percent of outside contact with the public, pointing out that she had contact with the public in her job as an account clerk and when she goes shopping or to the grocery store. *Id*. at 47, 61–62, 82–83.

Additionally, although Wiggins stated on her application that she uses a walker and cannot walk on rough terrain, her testimony shows that she could perform all the duties of a revenue examiner, including those in the field. Trial Tr. vol. 3, 40–52. She used her walker at work to get around the office, but she could travel to businesses, collect delinquent taxes, and see if business licenses were displayed. *Id.* at 41, 42, and 48. She drove to work in inclement weather. *Id.* at 60. She worked an eight-hour day and drove herself home. *Id.* at 41. She cannot walk up an entire flight of stairs, but she can walk up four or five steps. *Id.* at 56. When she went on the ride-along with a revenue examiner in 2015, she put her walker in the backseat and had no trouble going in and out of the businesses with her walker. *Id.* at 49–50. When shown a log of the businesses Vines visited as a revenue examiner, Wiggins said she had visited some of the businesses using her walker and that none were inaccessible to her.[15] *Id.* at 56–58.

### F.     The City's EEOC Response

A couple of months after promoting Urquhart over Wiggins for the third revenue examiner position, the City responded to Wiggins's EEOC charge. In that response, it described the reason Wiggins was not promoted as follows:

> As part of the essential functions and working conditions of the position of Revenue Examiner, the worker must be able to perform [field] work which involves traveling to and from local businesses, working in inclement weather, visiting construction sites, climbing stairs, walking over rough terrain, and minimal lifting of boxed documents. . . . In her application, Ms.

---

[15] Sometime during the 2014–15 timeframe, the City hired an individual in a wheelchair to "roll" the city and review plans for private buildings to ensure that businesses were compliant with the ADA and accessible to persons with mobility impairments. Trial Tr. vol. 1, 182–83; Trial Tr. vol. 3, 21–23. Comer agreed that revenue examiners conduct their work predominantly in the city—99 percent of the time. Trial Tr. vol. 2, 81. Therefore, most businesses that revenue examiners visit should be accessible to someone with a disability.

> Wiggins states that due to her previous knee surgery and knee replacement she currently uses a walker to support her knee. She further states that as the job description states, the applicant "must be able to walk on rough terrain which I cannot do." . . . Ms. Wiggins's statement in her application indicates that the previous Finance Director stated "this division needed one or two inside revenue examiners to work on sales tax." Ms. Wiggins fails to identify any type of reasonable accommodation.

Doc. 142-45 at 2. Crabb affirmed during his testimony that the above paragraph reflected the reason Wiggins was not promoted. Trial Tr. vol. 1, 204. Despite this affirmance, at trial the City all but abandoned its rough-terrain defense and focused on the requirement of going out in the field to call on businesses. A look at the way the job was actually performed, however, contradicts both of these explanations.

### G.    Evidence of the Revenue Examiner Job Duties

Vines and Urquhart testified at trial about their experience working as a revenue examiner. When asked to identify a business that would be difficult for someone with limited mobility, Vines identified only one business that had an uneven, gravel pathway, but he admitted it was not inaccessible. Trial Tr. vol. 3, 166–167. When Urquhart was asked the same question, her response had little to do with limited mobility. She referenced a building that requires visitors to go through someone at a front desk and said, "And sometimes as far as an address is concerned, if you have a building that has lots of suites in them, sometimes that can be a little difficult to contact the person that you thought [was] there and they're gone or they don't have that name of the business where you can readily determine if it's that actual business or not." *Id*. at 126–27. Neither witness identified a business that has rough terrain or stairs or that is located on a construction site, and

Urquhart said she has never visited a business on a construction site or with uneven terrain. *Id*. at 127, 144, 161–62.

As for the requirement of going into the field "on a daily basis," as Comer described it, the evidence was weak and inconsistent. For example, Vines, who was promoted on June 5, testified that it was "around a month" before he started going out into the field. *Id*. at 148. According to Urquhart, however, Vines and Jones were still working inside at least three months after they were hired. She remembers this because she started working at the front desk in August or September 2015 and sat between them to get much of her training. *Id*. at 145–46. Additionally, Vines and Jones maintained productivity logs, described by Comer as documents "primarily [for] those that are going out into the field" that "detail[] the activities that they conducted in regards to taxpayers that they have either seen or that they contacted during the course of a week." *Id*. at 132–33. There are no logs for Vines or Jones before October 2015, which supports Urquhart's testimony that they were still working inside in September. Docs. 142-10 and 142-11.

Vines testified that he went out in the field from 9:00 a.m. until 3:00 p.m. each day except during the license renewal period from February through April and after the 20th of each month, when he would spend a few days entering sales tax and getting everything caught up for administration. Trial Tr. vol. 3, 148–49. However, his production logs show that he was in the office more often. His log for October 2015 does not contain individual dates so there is no indication of how many days were spent in the field, but there are no log entries from November 14 through December 6, December 12 through February 15,

and February 20 through May 9. Doc. 142-11. When asked about these gaps, Vines testified:

> [T]hey generally just covered times of particular note with a delinquent business. There were several weeks throughout the year that nothing of any particular note happened that I would feel that I would need to make detailed documentation on because I might not be -- I probably wasn't going to be using that information at a later time. Generally, with my productivity reports, it was so I could create a timeline for counsel action at a later date.

*Id*. at 150. However, his log entries belie this explanation. While Vines may have documented some information for legal counsel, his log entries include activities such as "collected Sept taxes," "issued license," "entered missing month information," and "entered notes in business license for balance due." Doc. 142-11 at 1, 3, 5. It is difficult to see how an entry such as "reviewed folders for businesses currently visiting" could be used to "create a timeline for counsel action at a later date." *See id*. at 6. Vines later contradicted himself, stating, "But I made notes of pretty much every action I've taken from the point I was a revenue examiner." Trial Tr. vol. 3, 160. As a result, it is difficult to know what his productivity logs were meant to document, but, as something used by those "going out into the field" to "detail the activities they conducted," as Comer described, they do not support Vines's initial testimony that he worked inside only during the renewal period and after the 20th of the month. In fact, from November 1 through May 9, the entries indicate that he went out to visit businesses sixteen days.[16] To be fair, from May 10 through June 17, 2016, when the log ends, the logs show that he went into the field almost daily, but there was no

---

[16] The production logs show that he visited businesses November 2–5, 9–10, and 12–13; December 7–11; and February 16–17, and 19, for a total of only sixteen days in the almost six-and-a-half-month span. Doc. 142-11.

explanation at trial as to why his schedule changed.[17] Nevertheless, this record of field activity, which started four months after Vines was hired and ended around the time the EEOC concluded its investigation, does not convince the Court that going into the field on a daily basis was required.[18]

Cheryl Urquhart's testimony reenforces this conclusion. Before Urquhart was hired, Comer told her she would remain in the treasury department until she trained a replacement and would work inside for an unspecified period of time. Trial Tr. vol. 3, 131–132. Urquhart testified that she also had to spend time learning "some of the dynamics" of the job, and the City had to reassign the streets for the revenue examiners. *Id*. at 134, 143. The evidence does not indicate exactly how long this took, but Urquhart's job evaluation completed by Comer on November 21, 2016, shows that she had yet to work in the field and that one of her goals for the next evaluation period was "extensive training in the job duties of the revenue examiner." Trial Tr. vol. 2, 71–73; Trial Tr. vol. 3, 136–138. Thus, sixteen months after Comer recommended Urquhart over Wiggins because Wiggins used a walker and "would not be successful if she could not actually go out [in the field],"

---

[17] Defense counsel attempted to show that the productivity logs do not reflect Vines's time in the field and that he may have gone into the field on days that were not noted. However, Vines confirmed that he would have worked primarily in the office getting ready for the renewal period during the gap between December 11 and February 16 and that "for the most part" he worked inside from February 19 through May 10. Trial Tr. vol. 3, 164–65.

[18] Although J.C. Jones did not testify at trial, his productivity logs were admitted into evidence. Doc. 142-10. Like Vines, Jones's logs span from October 2015 to June 17, 2016, and they show he was in the field a total of 55 days—or an average of about seven days a month—from October through May. Like Vines, from June 1 and June 17, Jones spent most days in the field, but, again, this evidence does not support that a revenue examiner was expected to go in the field on a daily basis. Moreover, with respect to the particular businesses listed on Jones's logs, Comer agreed that they are required to be accessible to people with mobility impairments. Trial Tr. vol. 2, 187.

Urquhart had not gone in the field or even been trained. Trial Tr. vol. 3, 138. Urquhart continued working exclusively inside until sometime in 2017, although she could not say exactly when she began going out in the field.[19] *Id.* at 143.

In addition to Urquhart, there was evidence of other revenue examiners who worked primarily inside. For example, Vines was hired to replace a revenue examiner named Shundra Brown. Trial Tr. vol. 2, 52. Brown left before Comer began supervising the revenue examiners, but, based on Comer's observations of Brown working only inside, Comer thought she was an account clerk instead of a revenue examiner. *Id.* at 52–53, 89, 169. Comer also admitted that another revenue examiner, Renee Manning, worked primarily inside the office. *Id.* at 67–68, 183–84. After Manning left and shortly after Urquhart was promoted, the City hired Pamela Rowe in a newly-created Spanish-speaking revenue examiner position; in this position, she was designated as a "floater" to work primarily in the office. *Id.* at 66–67. Other than speaking Spanish, Rowe's job was identical to the positions awarded to Vines, Jones, and Urquhart. *Id.* 182–83. Rowe had never been an account clerk, but after extensive "foundational" training that may have taken three to six months, she "eventually" began going out into the field as often as the others revenue examiners, but there was no evidence of exactly when or how often this occurred. *Id.* at 207–08.

---

[19] Urquhart testified that now she spends five or six hours each day visiting businesses or finding vendors who are not licensed. Trial Tr. vol. 3, 121–124, 127. She responds to phone calls or emails for a couple of hours in the morning, and then she goes to lunch while she is out and gets back to the office around 3:30 or 4:00. *Id.* at 122–23. Again, there was no evidence of when this schedule began or what prompted it, and, as with Vines, Urquhart testified that she does not go out at all during renewal season. *Id.* at 123.

### H.    Comer's Explanation for Her Decisions

Comer testified about several considerations that appear to have influenced her decision not to recommend Wiggins for a promotion. In her deposition, she said Vines was better prepared in his interview than Wiggins:

> Well, for one thing, Mr. Vines did not do a lot of complaining in the interview. I think Ms. Wiggins spent a lot of time complaining about past administrations and different things that had occurred to her, so I would constantly have to bring us back to the interview questions.

Trial Tr. vol. 2, at 63. Despite drawing this distinction, Comer followed up by saying that Wiggins's complaints were "not a factor" in determining that Vines interviewed better— just something she "had to contend with during the interview." *Id*. at 88.

Comer also testified that the previous revenue supervisor, Connie Thomas, had given her information about Wiggins that influenced her decision. According to Comer, Thomas said Wiggins needed assistance with things that should have been fundamental. *Id*. at 119. Comer said she observed occasions when Wiggins had problems recalling certain information and that Wiggins consistently needed assistance from other employees. *Id.* at 119–20. However, she had no details about the type of task that required help and could not recall a time when Wiggins should have known something but did not. *Id*. at 120–21.

The above explanations are inconsistent with the City's EEOC response, which fails to mention any problems with focus during the interview, recalling information, needing assistance at work, or any other job performance issues. They are also inconsistent with Wiggins's 2015 job evaluation, mentioned above, which reflected no problems with job

performance, and her 2014 evaluation, which noted that she was very detailed and followed through to completion. *Id*. at 177–81; Doc. 142-14; Doc. 142-18. Moreover, Comer readily admits that she recommended Vines, Jones, and Urquhart for the revenue examiner positions because they were *physically* able to do the job better than Wiggins. Trial Tr. vol. 2, 62–64, 96, 125. She testified: "That was one of the essential functions of the job, is to be able to physically go out and perform responsibilities in the field. And as such, I did not think that she would – was qualified to be able to perform this job as written." *Id*. at 80. Finally, she testified twice during trial, without hesitation, that, "but for" Wiggins's disability, she "would like to think" she would have promoted Wiggins. *Id*. at 159, 202. Therefore, whatever problems Wiggins may have had during the interview or with recalling information or needing assistance, there is no question about why she was not promoted.

## I.     Damages

When Wiggins learned that she did not receive the 2015 promotion, she was understandably upset. Comer observed Wiggins crying and recalled several coworkers around her office comforting Mrs. Wiggins, and she testified that she has no doubt Wiggins suffered emotional distress as a result of being passed over. Trial Tr. vol. 2, 78. Wiggins testified that she felt devastated, heartbroken, and like she had been "put in [her] place." She felt like no one cared about her or her situation. Trial Tr. vol. 3, 66. Wiggins retired five months later on the last working day of December 2015, having unsuccessfully applied several times for the position of revenue examiner. *Id*. at 64. When asked why she retired, she stated, "Because I knew I had tried all I could do in work, and no one seemed to take interest or act like they cared. I just had given up any hopes of any promotion. I accepted

that." *Id*. at 64–65. Her last salary was $35,976.72, and her retirement benefits are calculated at 10.3 percent of her last salary. Trial Tr. vol. 1, 224–25; Doc. 142-17; Doc. 142-75 at 2. The pay range for a revenue examiner was $31,099 to $46,466. Trial Tr. vol. 1, 75.

## III.   CONCLUSIONS OF LAW

Plaintiff has asserted two theories under her ADA discrimination claim: failure to promote and failure to accommodate.

### A.   ADA DISCRIMINATION: FAILURE TO PROMOTE

#### 1.   Circumstantial Evidence Analysis

The ADA prohibits discrimination against a qualified individual with a disability because of the disability in regard to job application procedures, hiring, advancement, and other terms, conditions, and privileges of employment. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citing 42 U.S.C. § 12112(a)). Without direct evidence,[20] discrimination may be proved by circumstantial evidence under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (applying *McDonnell Douglas* to ADA case); *see also Barber v. Cellco P'ship*, 808 F. App'x 929, 934 (11th Cir. 2020) (stating that familiar burden-shifting analysis of Title VII claims is equally applicable to ADA claims) (citation omitted). Under this framework, a plaintiff must first

---

[20] The Court finds, *infra*, that there is direct evidence in this case based on Comer's statements. As explained in the text, even if Comer's statements are not direct evidence, Wiggins still prevails on the failure-to-promote claim under the slightly more onerous circumstantial-evidence analysis.

create a presumption of discrimination by establishing a prima facie case of discrimination. *Id*. (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)). The burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its employment action. *Barber*, 808 F. App'x at 934 (citing *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015)); *see also Wascura*, 257 F.3d at 1242). In doing so, "'the defendant must clearly set forth, through the introduction of admissible evidence,' the reason for its adverse employment decision, and that reason 'must be legally sufficient to justify a judgment for the defendant.'" *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981) and *Trotter v. Bd. of Trustees of Univ. of Alabama*, 91 F.3d 1449, 1455 (11th Cir. 1996), *abrogated by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)). If the defendant produces a legitimate, non-discriminatory reason for its employment action, the burden shifts back to the plaintiff to prove defendant's reason is a pretext for unlawful discrimination. *Barber*, 808 F. App'x at 934 (citing *Flowers*, 803 F.3d at 1336); *Holmes v. Alabama Bd. of Pardons & Paroles*, 591 F. App'x 737, 742 (11th Cir. 2014) (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007))).

An ADA failure-to-promote claim is evaluated under the same parameters as other ADA discrimination claims. *Barber*, 808 F. App'x at 934 (citing *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) and *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002) (stating a failure to promote is a "discrete discriminatory act" and constitutes an "adverse employment decision")). A plaintiff establishes a prima facie case of ADA discrimination by showing the following three elements: (1) she is disabled, (2)

she is a "qualified individual," and (3) she was discriminated against because of her disability. *Id.* (citing *Durley*, 236 F.3d at 657); *see also Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019) (citations omitted). To establish the third prong, a plaintiff must present facts that would permit a reasonable inference of discrimination. *Hawkins v. Dale Med. Ctr.*, No. 1:05CV540SRW, 2006 WL 1537228, at *8 (M.D. Ala. May 31, 2006) (citing *Cotton v. Hosp. Housekeeping Systems, Ltd.*, No. 2:04CV447FWO, 2005 WL 2654354, at *5 n.4 (M.D. Ala. Oct. 18, 2005)); *Boyd v. Province Healthcare Co.*, No. 04CV0825-WSD, 2005 WL 3132394, at *4 (S.D. Ala. Nov. 22, 2005) (noting that Eleventh Circuit has consistently applied the third element by requiring plaintiff to show employment action under circumstances suggesting a causal link to disability); *Brandon v. Lockheed Martin Aeronautical Sys.*, 393 F. Supp. 2d 1341, 1345–46 (N.D. Ga. 2005) (stating that for a prima facie case of disability discrimination, "the Eleventh Circuit has simply required a plaintiff to present facts from which an inference of discrimination can be made (as is true in all other discrimination cases)"). Finally, "[w]hen analyzing the alleged discrimination, '[t]he ADA imposes a "but-for" liability standard,'" which means the disability "need not be the sole reason for the alleged discrimination but must be 'a factor that made a difference in the outcome.'" *P.M. by and through Martine v. City of Winfield, Ala.*, No. 6:19-CV-623-LSC, 2021 WL 4950258, at *4 (N.D. Ala. Oct. 25, 2021) (quoting *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996)). *See Porterfield v. Soc. Sec. Admin.*, No. 20-10538, 2021 WL 3856035, at *4 (11th Cir. Aug. 30, 2021) ("[E]stablishing causation under the Rehabilitation Act . . . requires proof that the individual was discriminated against 'solely

by reason of her disability,' while the ADA requires a lesser showing of 'but for' causation.") (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).  Here, there is no dispute that Wiggins is disabled. Thus, for purposes of the prima facie case, the Court must determine whether Wiggins can establish the second and third elements above.

> **(a)      Plaintiff is a qualified individual who can perform the essential functions of the job without an accommodation.**

A "qualified individual" under the ADA is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position. 42 U.S.C. § 12111(8); *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). "Essential functions" are the fundamental duties of the position. 29 C.F.R. § 1630.2(n)(1). Determining whether a function is essential is done on a case-by-case basis and includes examining factors such as the time spent performing the function, consequences of not requiring an employee to perform the function, work experience of past employees, and current work experience of employees in similar jobs. *Davis,* 205 F.3d at 1305 (citing 29 C.F.R. § 1630.2(n)(3)). The employer's judgment as to what functions are essential is an important consideration, and a written job description is considered evidence of the essential functions of the job. *Id.* (citing 42 U.S.C. § 12111(8)); *see also Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 (11th Cir. 1997).

In its EEOC response, the City stated that Wiggins was not promoted because the job required walking over rough terrain, climbing stairs, and visiting construction sites, and it pointed out that Wiggins admitted she could not walk on rough terrain. Doc. 142-45 at

2. Despite the job description, based on testimony at trial, it is clear that walking on rough terrain and visiting construction sites are not essential functions of the revenue examiner's job. Urquhart testified that she has *never* visited a construction site or walked on rough terrain, and neither Urquhart nor Vines could think of a business that had rough terrain or was located on a construction site or was otherwise inaccessible to someone with limited mobility. Similarly, there was no testimony suggesting that climbing stairs was a regular occurrence—or that revenue examiners ever encountered stairs at all.[21] Analyzing the factors above, this evidence demonstrates that no time is spent walking on rough terrain, visiting construction sites, or climbing stairs, and no consequences would follow if an employee were not required to perform these tasks. Thus, the Court concludes that walking on rough terrain, visiting construction sites, and climbing stairs are not essential functions of the revenue examiner's job.

As mentioned above, at trial the City focused more on the requirement of simply going out into the field to show that Wiggins could not perform the essential functions of the job. For example, Cami Hacker testified: "[T]he revenue examiner is someone who goes out into the field and knocks on doors, making sure that the business licenses are there, that they are paying their taxes or refunding their taxes back to the City the way that they should be." Trial Tr. vol. 1, at 87. Vines testified, "As a revenue examiner, my primary job was to maintain a geographic area of the City of Montgomery . . . to be out in the field

---

[21] The Court is not suggesting that revenue examiners never had to walk up *steps* to enter a business, but neither Vines nor Urquhart mentioned stairs when asked to identify a business that may be inaccessible to someone with limited mobility. Wiggins testified that she could not walk up an entire flight of stairs but she could walk up four or five steps. Trial Tr. vol. 3, at 56.

to create a physical presence to make sure that all license and tax laws were followed." Trial Tr. vol. 3, at 153. When Comer was asked what sets revenue examiners apart from other positions, she said it was "going out of the office" and that account clerks "definitely are not going out into the field." Trial Tr. vol. 2, at 126, 132. She said it was not possible to perform the job of revenue examiner without going into the field, "according to the current job description," which she confirmed as an accurate reflection of what revenue examiners do. Trial Tr. vol. 2, at 129–30, 132.

While the evidence shows that some revenue examiners do go out into the field on a regular basis, it shows that those same revenue examiners spend a great deal of time inside and, further, that allowing revenue examiners to remain inside the office was common. Shundra Brown worked inside so often that Comer thought she was an account clerk, and Renee Manning and Pamela Rowe spent most of their time inside, demonstrating that going out into the field was a duty that could be easily modified.[22] According to production logs, Vines and Jones spent the first four months of their new jobs inside. Vines's records from October are unclear, but he was in the field only sixteen days from November through mid-May. For this same time period, Jones averaged only seven days a

---

[22] For Rowe to be a comparator in this case, Wiggins must show that she was "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019). In other words, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id*. at 1228 (citing *Young v. United Parcel Serv., Inc.,* 575 S. Ct. 1338, 1355 (2015)). The Spanish-speaking component of Rowe's job distinguishes it from the positions for which Wiggins applied, so Rowe is not similarly situated in all material respects. However, Comer conceded that there are many Spanish-speaking customers in the field, and the fact that Rowe eventually transitioned into outside duties, at least according to Comer, shows that working inside had little to do with her Spanish-speaking skills. Even if Rowe is not a proper comparator, designating her as a "floater" who would work primarily inside the office shows that going out into the field was a duty that could be modified.

month in the field. Finally, Urquhart worked inside, never even being trained, from the time she was hired in July 2015 until sometime in 2017.[23] There were no adverse consequences from allowing Brown, Manning, Rowe, or Urquhart to remain inside and no adverse consequences from allowing Vines and Jones to go out into the field as infrequently as they did. Therefore, the Court finds that going out into the field was not an essential function of the revenue examiner's job.

Even if going into the field were an essential function, the evidence establishes that Wiggins could have performed the job. She went on a ride-along with another revenue examiner, during which she used her walker to go into businesses with no problem. She testified that she was physically able to travel to businesses, collect delinquent taxes, and see if business licenses were displayed. She drove herself to work every day, even in inclement weather, and she worked a full day. She can walk up four or five stairs. This evidence supports a finding that, absent rough terrain, Wiggins could have performed the outside duties of a revenue examiner without an accommodation.[24] In making this determination, as set forth above, the Court does not accept Comer's testimony about conversations with Wiggins that occurred during the application and interview period. Comer's testimony that Wiggins said she could not go into the field is inconsistent with

---

[23] The Court is aware that the City produced production logs for Vines and Jones that ended in June 2016, the same time the EEOC concluded its on-site investigation of Wiggins's EEOC charge, and that Urquhart's extended stay inside the office ended sometime after the EEOC issued a determination on Wiggins's EEOC charge on November 3, 2016. Trial Tr. vol. 1, at 212, 215; Trial Tr. vol. 2, at 139–40.

[24] The City argues that Wiggins's case is based on her need for an accommodation to perform the job, foreclosing her from arguing that she could do the job without an accommodation. Doc. 154 at 13 n.4. However, when Wiggins suggested the accommodation of an inside position, she believed she needed it to deal with the requirement of walking on rough terrain. Comer claims she believed it as well, but she knew other revenue examiners who worked inside and still made no efforts to accommodate Wiggins.

Wiggins's application and Comer's interview notes, where it is evident that Wiggins anticipated going out into the field.[25] As a result, the Court finds that, even if going into the field were an essential function of the revenue examiner position, Wiggins could have performed that function without an accommodation. Therefore, Wiggins has established the second prong of her prima facie case.

> **(b)     Wiggins has shown that she was discriminated against because of her disability.**

To establish the third element of her prima facie case, Wiggins must present facts permitting a reasonable inference of discrimination. *Hawkins,* 2006 WL 1537228, at *8. The facts must show her disability was a factor that made a difference in the outcome. *P.M. by and through Martine*, 2021 WL 4950258, at *4 (quoting *McNely*, 99 F.3d at 1077). Wiggins has met this burden. First and most obvious, Comer testified that she recommended promoting Vines, Jones, and Urquhart, who had no disabilities, because they were better able to do the job physically. She also testified that, but for Wiggins's disability, she would have recommended Wiggins for the promotion. If these statements were not enough, the evidence shows that Wiggins had more experience in the "training ground" position than Vines, Jones, and Urquart *combined*, and her job evaluations showed that she was very detailed, followed through to completion, and met all expectations in performing that job. Finally, she applied multiple times, and each time the job was given to a candidate

---

[25] This credibility determination is also based on the inconsistencies in Comer's testimony about Wiggins's job performance, which conflicts with the City's EEOC response and with Wiggins's job evaluations, and her refusal to give a straightforward response to the question of whether Wiggins had complained of discrimination in her application.

without a disability. Because these facts permit a reasonable inference of discrimination and show that Wiggins's disability made a difference in the decision not to promote her, the Court finds that she has established a prima facie case of ADA discrimination for failure to promote.

### (c)     Wiggins has shown that the City's stated reason for its decision is pretext.

Because Wiggins has established a prima facie case, the burden shifts to the City to produce a legitimate, nondiscriminatory reason for its employment action. If the City meets that burden, the burden shifts back to Wiggins to demonstrate that the City's stated reason is pretext for impermissible discrimination. A plaintiff may demonstrate pretext by "revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer*, 509 F.3d at 1348 (internal quotation marks omitted); *Grandison v. Alabama State Univ.*, No. 2:20-CV-483-WKW, 2022 WL 418689, at *6 (M.D. Ala. Feb. 10, 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)). To establish that an employer's asserted reason was pretextual, a plaintiff must show both that the stated reason was false and that discrimination was the real reason. *Id.* (citing *Gogel*, 967 F.3d at 1136). The City has met its burden of producing legitimate, nondiscriminatory reasons for its decision; however, for the reasons stated below, the Court finds that Wiggins has met her burden of establishing that the stated reasons are pretext for impermissible discrimination.

With respect to any job performance problems, Comer's testimony on this issue conflicts with Wiggins's job evaluations, and there is no mention of performance issues in the EEOC response. This testimony was also too vague to support a decision based on poor job performance. Comer said Wiggins had problems recalling information, but she could think of no occasion when Wiggins should have known something but did not. She said other employees were required to assist Wiggins too often, but she knew nothing about the nature of the assistance or what kind of task was involved. Finally, Comer's unambiguous testimony that she would have promoted Wiggins "but for" her disability explains precisely why Wiggins was not promoted and confirms that job performance had nothing to do with her decision.

As for the City's argument that this "but for" statement is not evidence of discrimination and, instead, was a simple belief that Wiggins could not perform the physical aspects of the job, the Court addressed that argument above. Wiggins could perform the outside job duties, and she could do so without an accommodation. Moreover, the ADA was "enacted, in part, to eliminate the sort of stereotyping that allowed employers to see their employees primarily as their disabilities." *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1323 (11th Cir. 2019) (Jordan, J., concurring) (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 707 (6th Cir. 2001) and Lex Larson, 9 Employment Discrimination § 153.09[e] (2d ed. 2019) (explaining that the ADA, among other things, was meant to target "ignorance-based employment discrimination")). Comer's belief that Wiggins could not physically do the job was not based on a reasonably informed and considered decision. Her testimony demonstrates that she was new to her supervisory role

over the examiners, and she lacked a clear understanding of how much time revenue examiners spent in the field. Further, even if she believed Wiggins could not perform the outside tasks, she knew several revenue examiners who worked primarily inside, and she hired one revenue examiner with the understanding that she would remain inside indefinitely. Comer cannot point to particularized facts about Wiggins's condition to support her decision because she knew very little about Wiggins's condition and its resulting limitations, and Comer's beliefs about Wiggins's abilities constitute the type of reliance on stereotypes the ADA prohibits.

For these reasons, the Court concludes that Wiggins has demonstrated sufficient weaknesses, inconsistencies, and contradictions in the City's proffered legitimate reasons to find them false and unworthy of credence. *Springer,* 509 F.3d at 1348. The Court finds the City's stated reasons for failing to promote Wiggins to be pretext for impermissible discrimination, and it finds in favor of Wiggins on her ADA failure-to-promote claim.

### 2.    Direct Evidence Analysis

While the Court finds in favor of Plaintiff based on a circumstantial evidence analysis, the Court also finds the same result would be required under a direct evidence analysis. With direct evidence that discrimination was a motivating factor in an employer's decision, the analysis is different from a case with only circumstantial evidence. *Brown v. Metro. Atlanta Rapid Transit Auth.*, 261 F. App'x 167, 172 (11th Cir. 2008) (citing *Trotter*, 91 F.3d at 1453). *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (stating that "the ultimate issue of discrimination is proved" when plaintiff provides direct evidence of a discriminatory motive). Once discrimination is shown by direct evidence, the burden shifts

to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. *Williams v. Outokumpu Stainless USA, LLC*, No. CV 20-215-CG-MU, 2021 WL 4822832, at *14 (S.D. Ala. Oct. 15, 2021) (citing *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir. 1995) and *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir. 1985)).

Eleventh Circuit case law defines direct evidence of discrimination as "evidence that reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Williams*, 2021 WL 4822832, at *14 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (in turn quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998))). It is evidence that establishes a discriminatory intent without any inference or presumption. *Id.* (citing *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283 (11th Cir. 2000) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998))). Moreover, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).[26] On the other hand, if the evidence merely suggests a discriminatory motive, it is circumstantial evidence. *Id.* (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citing *Burrell v. Bd. of Trustees of Georgia Mil. Coll.*, 125 F.3d 1390,

---

[26] In *Rojas*, plaintiff's evidence was a statement made to another employee about that other employee. It was not made to the plaintiff or about the plaintiff. The court described it as "isolated and unrelated to the challenged employment decision" and held it was not direct evidence. *Rojas*, 285 F.3d at 1342–43. Here, the statement at issue was made from the witness stand about why Wiggins was not hired, and it requires no inference or presumption to establish discriminatory intent.

1393 (11th Cir. 1997))). The quintessential example of direct evidence would be a memorandum from company management directing the termination of an employee because he is disabled. *Id*. at *15 (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997)).

Here, Wiggins has presented direct evidence that she was not promoted because of her disability. Comer admits that she hired Vines, Jones, and Urquhart because she thought they were better able to do the job physically, and she testified pellucidly clear twice during trial that she would have promoted Wiggins "but for" her disability.

The City argues that Comer's statement is not direct evidence of unlawful discrimination and that the "obvious problem" is "such an interpretation would make it unlawful for an employer not to hire or promote an individual with a disability who could not perform the essential functions of the job." Doc. 154 at 2. The City goes on to argue that "[f]ailing to promote an employee who is not capable of performing the essential functions of the job is not *per se* unlawful, and it does not establish that the decision was made based upon an 'impermissible factor.'" *Id*. at 3. In other words, Wiggins's inability to do the job justifies Comer's refusal to promote her, thereby removing any discriminatory intent or animus from Comer's statement. [27]

---

[27] The City also suggests that Comer must have been motivated by malice or animosity about Wiggins's disability for the remark to constitute direct evidence. According to the City, a court's "sole concern is whether *unlawful* discriminatory animus motivates a challenged employment decision." Doc. 154 at 2 (citing *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001)). However, discriminatory intent can be established through discriminatory animus or deliberate indifference. Discriminatory animus requires prejudice, spite, or ill will. *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) (discussing discriminatory intent and discriminatory animus in context of Rehabilitation Act claim). Deliberate indifference occurs when a defendant knows that harm to a federally protected right is substantially likely and fails to act on that likelihood. *Id*. In other words, it is indifference by a deliberate

Of course, the City's argument on this issue is based on the premise that Wiggins could not perform the essential functions of the job, which, as explained, is not the case. The evidence shows that walking on rough terrain was not an essential function of the revenue examiner's job, going out into the field was not an essential function of the job, and, even if fieldwork were essential, Wiggins could do it. When Comer promoted others over Wiggins because of Wiggins's disability, she was indifferent to Wiggins's rights by deliberate choice. The City cannot paint Comer's stereotyped assumption as a belief that Wiggins's disability prevented her from doing the job when Comer had no informed understanding of what the job entailed and no understanding whatsoever of Wiggins's physical abilities within the context of the essential job functions. If this were a case regarding the hiring of a city bus driver and the applicant was legally blind and without a driver's license, the City's argument might work. It doesn't on these facts. Above the Court noted the quintessential example of direct evidence of discrimination: an employer's memorandum directing the termination of an employee because he is disabled. Comer's statement that she would have hired Wiggins but for her disability is no different.[28]

---

choice. *Id*. at 344–45. The discriminatory intent standard does not require a showing of bad motive, ill will, animosity, or intent to cause harm and injury, and a plaintiff may prove discriminatory intent by showing a defendant was deliberately indifferent to his statutory rights. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) (applying deliberate indifference standard to establish discriminatory intent in ADA and RA claims). Thus, Comer's statements must be "blatant and obvious," but they do not have to convey the malice or ill will of discriminatory animus.

[28] Although a defendant can prevail in a direct-evidence case by showing that it would have made the same decision anyway, Comer's "but for" statement forecloses any argument that she would have made the same decision absent the intentional discrimination. The City made no arguments in support of this defense.

## B.      ADA DISCRIMINATION: FAILURE TO ACCOMMODATE

As with the failure-to-promote claim, to state a prima facie claim for failure to accommodate under the ADA, Wiggins must show that she is disabled, is a qualified individual, and was discriminated against because of her disability. *Anderson v. Georgia-Pac. Wood Prod., LLC*, 942 F. Supp. 2d 1195, 1205 (M.D. Ala. 2013). The third element can be established by showing that an employer failed to "mak[e] reasonable accommodations to the known physical or mental limitations of the individual," unless the employer can demonstrate that the requested reasonable accommodation would impose an "undue hardship on the operation of [its] business." *Id.* (citing 42 U.S.C. § 12112(b)(5)(A) and *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship.") (emphasis in original)); *Crutcher v. Mobile Hous. Bd.*, No. 04-CV-499-WS-M, 2005 WL 2675207, at *11 (S.D. Ala. Oct. 20, 2005) ("It is well settled that an ADA violation occurs when an employer fails to provide 'reasonable accommodations' for an employee with a disability, unless doing so would impose an undue hardship on the employer.") (citing *Lucas,* 257 F.3d at 1255–56 and *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)). Further, the plaintiff bears the burden to identify an accommodation and show that it is reasonable. *Earl,* 207 F.3d at 1367; *Lucas,* 257 F.3d at 1255–56.

As the City correctly argues, an employer's duty to provide a reasonable accommodation is not triggered unless the plaintiff makes a specific demand for an

accommodation. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (citing *Wood v. President and Trustees of Spring Hill College in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992)). If a specific demand is made, however, the ADA provides that an employer may need "to initiate an informal, interactive process with the individual with a disability in need of an accommodation" to identify the person's "precise limitations" and "potential reasonable accommodations." 29 C.F.R. § 1630.2(o)(3). "[F]or a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant 'must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation." *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (per curiam) (citation omitted). Before an employer's duty to provide a reasonable accommodation—or even to participate in the interactive process—is triggered, the employee must make an adequate request that puts the employer on notice. *Lusk v. Daewon Am., Inc.*, No. 318CV00884RAHSMD, 2020 WL 3105408, at *3 (M.D. Ala. June 11, 2020) (citing *Gaston*, 167 F.3d at 1363–64).

In this case, Wiggins stated on her application that she could not walk on rough terrain because of her walker and that she could benefit from an inside position. This informed the City of her disability, stated precisely what she could not do, and suggested the accommodation of working inside. The Court finds that these statements were sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for

an accommodation, triggering the City's duty to initiate an informal, interactive process and identify Wiggins's limitations and potential and reasonable accommodations.

In response to Wiggins's request, the City took no action toward a reasonable accommodation. Comer read Wiggins's application and did nothing. Wiggins brought up the ADA and the possibility of accommodating a disabled employee in her interview, and Comer did nothing. Barry Crabb and Charlie Wilson knew of Wiggins's complaints and her request for an accommodation, and they did nothing. When Carmen Douglas became aware of Wiggins's complaints in her application, she did nothing. When Douglas received a letter from Wiggins's attorney enclosing an EEOC charge, she did nothing. This stonewalling approach made it impossible for Wiggins to participate in an informal, interactive process. *See McClain v. Tenax Corp.*, 304 F. Supp. 3d 1195, 1205 (S.D. Ala. 2018) (in case where plaintiff informed managers that pallet-wrapping duties were too difficult and asked for modification to delete those duties from position, managers' statement to perform the duties or resign was an "all-or-nothing ultimatum . . . [that] slammed the door on any possibility of a reasonable accommodation, foreclosed the option of [plaintiff] working just part-time as a janitor (without the pallet-wrapping duties), and obliterated any possibility that the ADA interactive process could ever take place").

The City argues that its obligations to engage in an interactive process and reasonably accommodate Wiggins were never triggered because her requested accommodation was unreasonable. But this ignores the very purpose of the interactive process. The process should be viewed with a problem-solving mindset. It should be a mutual and searching evaluation of options to determine whether there are any reasonable

accommodations that would allow the employee to perform the essential job functions. *See* 29 C.F.R. § 1630.2(o)(3) (stating that the process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations"). The City abdicated its responsibility when it concluded, unilaterally, that an inside-only revenue examiner was not possible, ending the evaluation of accommodation before any dialogue occurred. Instead, at a minimum, the City should have evaluated Wiggins's actual limitations, the essential job functions, and any reasonable accommodations in that context while in dialogue with Wiggins. It did not. For example, if the limitation was "no rough terrain," then the dialogue should have considered whether traversing rough terrain is actually an essential job function (it is not, as the Court has already determined). If it were an essential job function, then the City should have dialogued further to determine if there was a reasonable accommodation to allow Wiggins to perform the function. As Wiggins testified, she could have called the taxpayer to meet her outside a business if she found herself confronted with rough terrain. It might have been possible to accommodate Wiggins by reassigning a business with rough terrain to another examiner in exchange for visiting a business that had no such obstacle or with assignment of inside-only job duties. These are only a couple of logical accommodations that could have been considered, and an interactive process would likely have uncovered more.

In any event, the City's reliance on a view that foreclosed an inside-only accommodation and any further discussions about accommodation is unsupported based on the evidence. According to the City, allowing Wiggins to work inside would mean the

creation of a new position. Of course, that is not required under the ADA. *See, e.g., Smith v. Sturgill*, 516 F. App'x 775, 776 (11th Cir. 2013) ("[a]n employer need not create a new position for an employee as an accommodation"). However, the evidence shows that several existing revenue examiners worked inside all the time. Brown and Manning worked inside almost exclusively. After Wiggins asked for the accommodation of working inside, Vines and Jones were hired, and they worked inside for the first four months. After that, Vines went out minimally, and Jones went out approximately one-third of the time. Urquhart was hired next, and she worked exclusively inside for more than sixteen months. Therefore, to the extent that Wiggins believed she needed an accommodation to walk on rough terrain, her request to work inside was entirely reasonable. And allowing her to work inside would not require the creation of a new position. The City could have hired Wiggins to perform the same duties Manning and Brown performed. It could have hired her to perform the same duties Urquhart performed. It could have hired her for Vines's position, modified to delete the minimal amount of time he spent in the field. Comer testified, after all, that allowing Wiggins to work inside would not have caused an undue hardship or operational problems.

The problem with this claim, for Wiggins, is that the Court has already found Wiggins could do the revenue examiner job without an accommodation. If an employee does not need an accommodation to perform the essential functions of the job, the law is settled that an employer is not obligated to provide one, even if the employee requests a reasonable accommodation that could be easily provided. *D'Onofrio v. Costco Wholesale*

*Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020), *cert. denied,* 141 S. Ct. 1435 (2021) (citing *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999)).

In this case, Wiggins requested an accommodation because the job description said that walking on rough terrain was an essential function. The City, while insisting that walking on rough terrain, climbing stairs, visiting constructions sites, and going into the field daily were essential functions of the job—and believing that Wiggins's walker prevented her from doing these very things—ignored Wiggins's request and failed to offer her any reasonable accommodation. Thus, to the extent the above tasks were essential functions of the job and to the extent Wiggins's walker prevented her from performing them, the Court finds that the City's duty to engage in an informal, interactive process was triggered; that Wiggins's request to work inside was reasonable, triggering the City's obligation to modify the job duties to provide this accommodation; and that the City failed to provide the requested reasonable accommodation. However, under these specific facts and because the Court has fully credited Wiggins's testimony of her physical abilities, the Court cannot find the City liable on this claim. The City unquestionably failed in every aspect of its obligation to provide Wiggins with a reasonable accommodation, but it avoids liability here only because the Court finds that Wiggins could perform the job without one.

## C.    RETALIATION UNDER THE ADEA, ADA, AND TITLE VII

In general, the ADEA, ADA, and Title VII prevent an employer from retaliating against an employee because the employee opposes any unlawful employment practices or because the employee has made a charge, testified, assisted, or participated in any manner related to an unlawful employment practice. *See generally* 42 U.S.C. § 2000e-3(a) (Title

VII); 42 U.S.C. § 12203(a) (ADA); 29 U.S.C. § 623(d) (ADEA). Absent direct proof of retaliation, the *McDonnell Douglas* burden-shifting framework applies. *Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018) (ADA retaliation); *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (Title VII retaliation); *King v. Adtran, Inc.*, 626 F. App'x 789, 792 (11th Cir. 2015) (citing *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (ADEA retaliation)).

A prima facie case of retaliation has three elements: the plaintiff engaged in statutorily protected conduct; the plaintiff suffered an adverse employment action; and the adverse action was causally related to the protected expression. *Ambus v. AutoZoners, LLC*, 71 F. Supp. 3d 1280, 1301–02 (M.D. Ala. 2014) (citing *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (quotation omitted)). A causal relationship must be shown through evidence that the "desire to retaliate" against the protected expression was the "but-for cause" of the employment action. *Id.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). If the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action. *Id.* (citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)). If the employer meets this burden, the employee must show that the employer's legitimate reason was pretextual. *Id. (*citing *Shannon*, 292 F.3d at 715).

In this case, Plaintiff's evidence of retaliation centers on the temporal proximity of the events surrounding Comer's decisions. Plaintiff complained of age discrimination on her April 15 application and again during her May 28 interview. Four days later Comer recommended Jones and Vines for the two open revenue examiner positions. On June 22,

Wiggins's attorney sent a letter to the City complaining of discrimination and attaching a copy of Wiggins's EEOC charge. On July 9, Comer recommended Urquhart for promotion. Crabb testified that he received the letter from Wiggins's attorney on June 29 and that he discussed it with Comer, but there is no record of when this occurred. Thus, although Comer admits that she became aware of Wiggins's EEOC charge at some point, there is no evidence that she knew about the charge before her July 9 decision. While this temporal proximity suggests retaliation and would be enough to establish a prima facie case, "temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." *Smith v. Ferguson Enter., LLC*, No. CV 20-0002-CG-C, 2021 WL 2403456, at *5 (S.D. Ala. June 11, 2021) (citing *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203 (11th Cir. 2021)). Therefore, assuming Wiggins could establish a prima facie case and that the City could provide a legitimate, non-retaliatory reason for its decision, without more, Wiggins cannot establish that the City's reason was pretext for retaliation.[29] The Court has no reservations, based on the evidence presented at trial, concluding that Comer chose not to promote Wiggins because she is disabled. However, there is insufficient evidence for Plaintiff to prevail in her claims of retaliation, and the Court finds in favor of Defendant on these claims.

---

[29] Wiggins has argued that Comer's statement about Wiggins's interview—that she "spent a lot of time complaining about past administrations and different things that had occurred to her"—proves retaliatory intent. However, because staying focused is an important skill and one that is routinely evaluated during an interview, the Court finds that this statement, even when considered with the temporal proximity of events, is insufficient to demonstrate a retaliatory intent.

## IV.    DAMAGES

Having determined that Plaintiff is entitled to judgment on her ADA failure-to-promote claim, the Court finds that Plaintiff is entitled to the damages set forth below.

Plaintiff is entitled to approximately seven months of backpay for lost wages and retirement benefits from the date of Vines's and Jones's promotions through her retirement at the end of December 2015. As an individual being promoted from account clerk into revenue examiner, Wiggins would have been placed into the next salary step within the revenue examiner grade that was above her account clerk salary at the time she was promoted. Trial Tr. vol. 1, at 181.

Because the parties did not provide the Court with a backpay calculation covering the salary grade within the revenue examiner pay grade steps to which Wiggins would have been promoted, the Court ORDERS the parties to file a **JOINT** submission within **SEVEN DAYS** from the date of this order that includes (1) the revenue examiner pay grade chart for the period from June 5, 2015, through Wiggins's retirement, specifying the exact step within the chart where Wiggins would have been placed if she had been promoted on June 5, 2015; (2) the amount of backpay to which Wiggins is entitled under this Order, with an agreed-upon interest calculation, for that same period; and (3) the amount of retirement benefits to which Wiggins is entitled under this Order, with an agreed-upon interest calculation, for the same period.[30]

---

[30] Wiggins's last salary was $35,976.72, and the pay range for the revenue examiner position at the time Wiggins applies was $31,099 to $46,466. Plaintiff argued in her post-trial brief that backpay should be awarded based on the top range of $46,466, but the evidence shows that Wiggins would have moved only to the next step within the revenue examiner grade that was higher than her then-current salary. Trial Tr.

Upon receipt of this information, the Court will award Wiggins backpay, including lost retirement benefits, for this period, plus prejudgment interest.

The Court awards Plaintiff $150,000 in compensatory damages for the emotional distress and mental anguish that she suffered as a result of Defendant's actions.

The Court will also award Wiggins her reasonable attorneys' fees and court costs, upon proof of such amount, to be submitted within **SEVEN DAYS** of this Order.

## V.     CONCLUSION

For the reasons set out in this Opinion and Order and pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court GRANTS Plaintiff's Motion for Judgment as a Matter of Law dated July 21, 2021, with respect to Plaintiff's ADA failure-to-promote claim but DENIES the motion with respect to Plaintiff's remaining claims.

A separate judgment will issue.

DONE this 3rd day of March, 2022.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

---

vol. 1, at 181. Accordingly, the Court expects that the City can produce a chart identifying the salary steps within the revenue examiner pay grade.